******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

CHRISTOPHER GASKIN *v.* COMMISSIONER
OF CORRECTION
(AC 39462)

Sheldon, Bright and Flynn, Js.

*Syllabus*

The petitioner, who had been convicted of murder, conspiracy to commit
murder and tampering with a witness in connection with the shooting
death of the victim, sought a writ of habeas corpus, claiming that his
rights to due process were violated when the prosecutor at his criminal
trial elicited testimony from a cooperating witness, E, which the prosecu-
tor knew to be false, failed to correct that testimony before the jury
and then relied on it during closing argument to the jury. E, who also
had been charged with the victim's murder, was the only witness who
placed the petitioner at the crime scene with the likely murder weapon
in his hand. During colloquy with the court and the petitioner's trial
counsel prior to the start of trial, the prosecutor denied having promised
anything to E in exchange for his testimony and stated that E had
been told that his cooperation and truthfulness in testifying against the
petitioner would be brought to the attention of the sentencing court in
E's case. E thereafter testified that he had never been told that if he
testified truthfully, the state would bring his cooperation to the attention
of the court in his own case, and he denied that any promises had been
made to him in exchange for his testimony. The petitioner filed a direct
appeal from his conviction, but the trial court granted his appointed
appellate counsel permission, under *Anders* v. *California* (386 U.S. 738),
to withdraw from representation after she reviewed the trial record and
determined that there were no nonfrivolous issues to be raised on appeal.
The petitioner thereafter withdrew his direct appeal. After E testified
at the petitioner's trial and pleaded guilty in his own case, the prosecutor
in E's case, who was the same prosecutor as in the petitioner's criminal
trial, made the sentencing judge in E's case aware of E's involvement
in the petitioner's criminal trial. E's sentence was thereafter reduced
twice. It was not until the prosecutor testified in the petitioner's habeas
trial that it became clear to the petitioner that E had testified falsely
about whether the prosecutor had promised him anything in exchange
for his testimony. The habeas court concluded that the petitioner had
procedurally defaulted his due process claim because he failed to raise
it in his direct appeal, and failed to establish cause and prejudice for
his default. The habeas court further determined that although E testified
falsely, there had been no need for the prosecutor to correct E's testi-
mony because the prosecutor previously had disclosed to the petitioner's
trial counsel the promise to E. The habeas court rendered judgment
denying the petition for a writ of habeas corpus and, thereafter, denied
the petition for certification to appeal, and the petitioner appealed to
this court. *Held*:

1. The habeas court abused its discretion in denying the petition for certifica-
tion to appeal from the judgment denying the habeas petition; the issues
of whether the petitioner had procedurally defaulted his due process
claim and whether his due process rights were violated were debatable
among jurists of reason, they could be resolved in a different manner
and they were adequate to deserve encouragement to proceed further,
as the appellate courts of this state have not yet addressed the issues
of whether a petitioner procedurally defaults a claim when his appellate
counsel withdraws from representation, with permission of the court,
after having reviewed only the record and without having investigated
new information outside the record that could develop a due process
claim, or what constitutes cause and prejudice should such a default
exist.

2. The petitioner did not procedurally default his due process claim:
a. The criminal trial record was inadequate for the petitioner to have
raised his due process claim on direct appeal: the prosecutor's state-
ments regarding any promise to E were ambiguous and contradictory,
the petitioner's trial counsel cross-examined E, to no avail, regarding

the prosecutor's promise to him, information regarding E's sentencing became available only after the petitioner's criminal trial, and the petitioner's appellate counsel, who had been granted permission to withdraw after she determined that there were no nonfrivolous claims to raise on appeal, had no duty to investigate or to augment the record; moreover, the requirements of the cause and prejudice doctrine parallel certain of the requirements to establish that material evidence has been suppressed under *Brady* v. *Maryland* (373 U.S. 73), and although this court was not at liberty to overrule precedent from our Supreme Court and this court applying the procedural default doctrine to due process claims under *Brady* and its analogues, prudential considerations underlying the procedural default doctrine warranted looking past procedural default to address the merits of the petitioner's due process claim.

b. Even if the petitioner procedurally defaulted his claim, he established cause for any procedural default: because the factual basis underlying the petitioner's due process claim was not fully available until after his appellate counsel, who had no duty to investigate it under *Anders*, moved to withdraw, such information was not reasonably available and it would be contrary to *Anders* to impose on appellate counsel the additional duty of investigating whether there are possible claims outside the record, as *Anders* requires only that appellate counsel look to the record to decide if there are appealable issues, it would defy reason to expect incarcerated individuals, such as the petitioner, to be able to develop new claims from the confines of prison after appellate counsel has been permitted to withdraw from representation, and the harm to the petitioner here stemmed from E's truculence and the petitioner's inability to respond effectively in light of the prosecutor's silence in that it was not until the prosecutor testified at the habeas trial that there was a complete factual record to prove the petitioner's claim; moreover, it was error for the habeas court to suggest as support for a lack of cause that the petitioner could have petitioned for a new trial, as a motion or petition for a new trial is not part of a direct appeal, augmentation of the record is not necessary for a direct appeal, and the return of the respondent Commissioner of Correction asserted only that the petitioner had procedurally defaulted because he did not raise his due process claim on direct appeal.

c. The petitioner established the requisite prejudice to overcome any procedural default; E's testimony was material to the petitioner's conviction of murder and conspiracy to commit murder, the petitioner's trial counsel was unable to get E, who repeatedly stonewalled counsel when questioned about his motives for testifying, to admit to the jury that E had some promise from the state regarding his cooperation, the trial court's jury instructions regarding witnesses' cooperation could not obviate the prejudice emanating from E's false testimony, the prosecutor sharpened that prejudice by suggesting in closing argument to the jury that E had everything to lose and nothing to gain by testifying, and that E had no interest in the outcome of the petitioner's case, and the impeachment of E through knowledge of his prior criminal convictions would not have mitigated the prejudice that resulted from his false testimony.

3. The petitioner's due process rights were violated as a result of the prosecutor's use of E's false testimony and suggestion to the jury that E had no interest in the outcome of the petitioner's trial:

a. E's false testimony was material to the petitioner's conviction of murder and conspiracy to commit murder, as there was a reasonable likelihood that E's testimony or the prosecutor's reliance on it in closing argument could have affected the verdict of the jury: E was the only witness to tie the petitioner to the murder scene or place a revolver in the petitioner's hands at the time and place of the killing, there was no physical evidence to tie the petitioner to the crime scene, there could be no claim that the prosecutor, who was also the prosecutor in E's guilty pleas, was unaware of the promises made to E because the prosecutor promised to bring E's testimony to the attention of E's sentencing judge, the prosecutor's argument to the jury enhanced E's credibility by stating that E had everything to lose and nothing to gain, and although the prosecutor claimed that he did not know if E expected anything in exchange for his testimony, the prosecutor had told E that the state would bring his testimony to the attention of the sentencing judge in E's case; furthermore, the state's case against the petitioner was weak, as E was not an eyewitness to the shooting, and the testimony of the

only other witness to implicate the petitioner was based on an alleged admission by the petitioner to that witness, who was unhappy with him for personal reasons.

b. Although there is a split in this court's precedent as to whether disclosure of an agreement between the state and a cooperating witness needs to be made only to a criminal defendant or whether it also must be made to the jury, the jury here was entitled to know about the state's promise to E; E's credibility was important, as the state's case was also almost entirely dependent on his testimony, evidence of the state's promise to him bore on whether E had anything to gain by testifying, the jury was not made aware of the agreement between E and the state, and even if the prosecutor satisfied his disclosure requirement by informing the petitioner's trial counsel of the state's promise to E, the petitioner still was harmed, as the prosecutor's disclosure was negated by his harmful bolstering of E's testimony during closing argument to the jury.

4. The petitioner's conviction of tampering with a witness was not improper; the jury reasonably could have found from evidence of the petitioner's letters to his girlfriend that he had attempted to induce her to withhold testimony, and although the petitioner claimed that his conviction of the tampering charge was buoyed by his conviction of murder and conspiracy to commit murder and E's false testimony concerning those charges, tampering with a witness can be established even in the absence of the conviction of other crimes, and E's false testimony was not material to the charge of tampering with a witness.

Argued February 1—officially released July 24, 2018

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Fuger, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Reversed in part; judgment directed; further proceedings.*

*Jennifer L. Bourn*, assistant public defender, with whom, on the brief, was *Denis J. O'Malley*, certified legal intern, for the appellant (petitioner).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Angela R. Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

FLYNN, J. It has been usual for trial judges, when instructing jurors on how to weigh the credibility of witnesses, to tell them to consider whether the witness has an interest of whatever sort in the outcome of the trial that might influence or color the witness' testimony. In the petitioner's criminal trial, however, the jury never received important evidence of a cooperating witness' interest in the outcome. This appeal requires us to examine a situation where a necessary cooperating witness, the only one who put the defendant at the crime scene with the likely murder weapon in his hand, falsely denied before the jury any promise from the state in exchange for his testimony and such falsity was not disclosed to the jury, but the prosecutor argued in summation to the jury that the witness had "everything to lose, nothing to gain," by giving statements to the police and testifying. We hold this scenario to be antithetical to due process under the fourteenth amendment to the United States constitution.

The petitioner, Christopher Gaskin, filed this appeal following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court: (1) abused its discretion in denying his petition for certification to appeal; (2) erred in finding that the petitioner's due process claim[1] was procedurally defaulted; and (3) in addressing the merits, erred in finding that the state did not deprive the petitioner of his due process rights when it did not correct a witness' known false testimony at the underlying criminal trial. We agree with all of the petitioner's claims as they pertain to his underlying convictions of murder and conspiracy to commit murder under General Statutes §§ 53a-54 and 53a-48, respectively. Accordingly, we reverse in part the judgment of the habeas court and remand the case to the habeas court with instruction to render judgment granting the petition for a writ of habeas corpus, vacating the petitioner's underlying convictions of murder and conspiracy to commit murder, and ordering a new trial on those charges. We affirm the judgment as to the petitioner's underlying conviction of tampering with a witness under General Statutes § 53a-151.

The record reveals the following facts and procedural history. The underlying criminal proceedings stem from the shooting death of Kendall Williams-Bey in Hartford on July 6, 1998. The petitioner eventually was charged with Williams-Bey's murder and with tampering with a witness.[2]

At trial, only two witnesses implicated the petitioner in Williams-Bey's murder: Benjamin Ellis and Evelyn Douglas.[3] Ellis, a cooperating witness, testified that he drove the petitioner and another man, later identified as

Trevor Bennett,[4] past the crime scene and then parked nearby. While Ellis waited in the car, the petitioner and Bennett got out of the vehicle carrying guns, the petitioner carrying a revolver and Bennett carrying an "automatic." Shortly thereafter, Ellis testified that he heard gunshots and then the petitioner and Bennett returned. Ellis then drove his passengers away from the area and dropped them off at various points in Hartford. James Stephenson, the state's firearms identification and testing expert, testified that the bullet that killed Williams-Bey was fired from a revolver.

Douglas, the petitioner's girlfriend with whom he lived at the time, testified that the petitioner admitted to her that he shot Williams-Bey. She testified that, prior to the shooting, the petitioner arrived home with a busted lip and told Douglas he had gotten into a fight with London Johnson at a nightclub in Springfield, Massachusetts. She stated that the petitioner said he was going to "get" Johnson. She said that when the petitioner came back to her apartment later, he said, "I just f---d up. . . . I didn't mean to shoot Kendall." She testified that he meant to shoot Johnson, who was near the crime scene when Williams-Bey was shot. Douglas' testimony did not tie the petitioner to the murder scene or possession of a revolver of the kind that killed the victim. Only Ellis' testimony established that.

Many times prior to Ellis' trial testimony, the petitioner's trial counsel asked for any information on agreements or promises the state may have made with any witnesses, particularly Ellis. Because Ellis also was being charged with Williams-Bey's murder, the petitioner's trial counsel wanted to know if the state had promised anything to him in exchange for his testimony. The prosecutor denied that any deal had been made. Just prior to trial, the following colloquy between the trial court and the prosecutor took place:

"The Court: . . . Now, was anything offered to [Ellis]?

"[The Prosecutor]: No, Your Honor. It's standard routine, no offers are made. When I have a case, they are told that I will not make any agreement with them. They have to testify, and if they expect something that's within their—it's not—not something—I—I do not or neither does my inspector, anybody involved with me, make any offers.

"The Court: Right. Well, in the old days what used to be done was, the phrase, as I recall it, was, make your truthful cooperation—truthful and full cooperation known to the sentencing judge.

"[The Prosecutor]: Yes.

"The Court: Was that done in this case?

"[The Prosecutor]: Yes. The sentencing judge would

be told that he gave a statement, but the thing he was told is he has to tell the truth, and it's not within my province, it's within the sentencing judge's province, which is the standard procedure . . . ."

During the trial, the prosecutor asked Ellis whether he was made any promises in exchange for his testimony, which Ellis denied. The prosecutor asked Ellis why he gave his statements to the police, to which Ellis replied that he "felt bad about the incident." Ellis also stated that he was happy he was "doing the right thing." On cross-examination, the petitioner's trial counsel engaged in the following questioning of Ellis:

"Q. . . . Have you met with [the prosecutor] at any time in this case?

"A. With [the prosecutor] and my lawyer.

"Q. Okay. . . . The answer to that, I take it, is yes?

"A. Yes.

"Q. Okay. And was it your understanding as a result of the meeting that the state wanted you to testify truthfully?

"A. Yes.

"Q. Okay. And was it your understanding that if you testified truthfully, the state would take that into consideration in deciding what would happen in the case in which you're charged?

"A. No. I wasn't made any promises.

"Q. I didn't ask you, sir . . . if you were made any promises. What I asked you was—was it your understanding that if you testified truthfully, the state would take that into consideration in deciding the outcome of your case?

"A. I'm not sure.

"Q. You're not sure?

"A. No.

"Q. Was it discussed?

"A. No."

Later, the petitioner's trial counsel questioned Ellis as follows:

"Q. Is it your understanding that after you testify, by truthful testimony, that the state will bring your cooperation and truthfulness to the attention of the court?

"A. I was never told that.

"Q. And you don't have that expectation?

"A. No.

"Q. And you are aware, because of your experience in the system, that the state can change any of the

charges it wants against you . . . ? Do you want me to rephrase that?

"A. No. I understand.

"Q. You are aware of that?

"A. I wasn't sure of that, but now I know."

During closing argument, after Ellis had given testimony inculpating the petitioner in the killing, the prosecutor stated that Ellis "wanted to get [his testimony] off his chest. He knew and knows that his statements put him in the mix." On rebuttal, the prosecutor then argued that Ellis "had everything to lose, nothing to gain, by giving these statements" and that Ellis "has been charged with this crime, too. And his position is he's only the driver, he had nothing to gain by giving both statements. He clearly said he wasn't made any promises. Does he expect something? That's in his mind. I don't know. But the reality is: he is in the mix."

The record reveals that the prosecutor never corrected Ellis' testimony before the jury in which Ellis told the jury that he had never been told that, after he testified truthfully, the state would bring his cooperation and truthfulness to the attention of the sentencing court.

On July 7, 2003, the jury found the petitioner guilty of all the charges. He was sentenced to a total effective sentence of sixty years imprisonment. On December 30, 2003, the petitioner filed a direct appeal. His appointed counsel later moved to withdraw as appellate counsel, filing an *Anders*[5] brief on December 29, 2004, in which she stated that there were no nonfrivolous issues for appeal, and was permitted to withdraw by a judge of the Superior Court on September 11, 2006. The petitioner then represented himself pro se until withdrawing his direct appeal seven years later on April 10, 2013.

After testifying at the petitioner's and Bennett's criminal trials, Ellis, on November 4, 2004, pleaded guilty to violating General Statutes § 53a-59 (a) (3), accessory to assault in the first degree.[6] The prosecutor, the same as in the petitioner's case, recommended a sentence of twenty years, suspended after five years, with five years probation, to run concurrently with a sentence Ellis then was serving for the commission of an unrelated crime. As promised, the prosecutor made the sentencing judge aware of Ellis' involvement in the petitioner's criminal trial. On September 7, 2005, Ellis' sentence was reduced to twenty years, execution suspended after three years, with five years probation. Ellis' prior sentence, which he was serving at the time of the petitioner's criminal trial, also later was reduced in 2005 by three years on the prosecutor's recommendation for "[s]ubstantial aid and cooperation in several serious felony cases." That sentence could only be modified by reduction pursuant to General Statutes § 53a-39 (b),[7] which requires the assent of the prosecuting authority

prior to its reduction.

On September 10, 2012, the petitioner filed a pro se petition for a writ of habeas corpus. Then, after counsel was appointed, the petitioner filed his operative petition on December 9, 2014. The petitioner alleged that the prosecutor violated his constitutional rights in failing to correct Ellis' false testimony and in failing to disclose exculpatory materials. Specifically, the petitioner alleged that Ellis lied at the petitioner's criminal trial when he testified that he did not receive or expect to receive any consideration for his testimony against the petitioner. The respondent, the Commissioner of Correction, filed his amended return on February 11, 2015, denying the allegations and claiming that the petitioner procedurally defaulted on his claim because he did not directly appeal his underlying criminal conviction on the grounds raised in his petition and that he established neither cause nor prejudice for his procedural default. In his reply, filed February 26, 2015, the petitioner denied procedurally defaulting his claim, but also stated that, if he did procedurally default his claim, there was cause and prejudice for doing so. Specifically, the petitioner stated that cause existed because "at the time his appeal was pending, there was no additional evidence available to the petitioner or his appellate attorney which could have shown that Benjamin Ellis received consideration for his testimony. It was not until later that evidence became available to prove this claim." The petitioner stated that he also was "prejudiced because the jury hearing his criminal trial did not know of Benjamin Ellis' self-serving motivations for testifying against the petitioner, and the [prosecutor] allowed him to testify in an untruthful manner without correcting his testimony."

The matter proceeded to a habeas trial, which included the testimony of Ellis; John L. Stawicki, Ellis' attorney at the time of his testimony and in his subsequent pleas; and Victor Carlucci, Jr., the prosecutor in the petitioner's criminal trial and Ellis' later pleas. Ellis testified that he was made no promises for a reduction in his charges or anything else in exchange for his testimony, although he said that he hoped his testimony would help him. Stawicki and the prosecutor both testified that the prosecutor made no specific promises, other than to convey Ellis' cooperation to his sentencing judge.

In its memorandum of decision dated June 23, 2016, the habeas court denied the petition on the ground that the petitioner procedurally defaulted his claim and failed to establish cause and prejudice for his default. Nonetheless, the court also addressed the merits of the petitioner's claim, finding that, although Ellis testified falsely, the prosecutor had disclosed his promise to Ellis to the petitioner's trial counsel, which obviated any need to correct the false testimony. The petitioner

requested certification to appeal, which was denied by the habeas court on July 6, 2016. This appeal followed.

On appeal, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal; erred in finding that the petitioner's due process claim was procedurally defaulted; and in addressing the merits, erred in finding that the state did not deprive the petitioner of his due process rights when it did not correct a witness' false testimony at the petitioner's criminal trial and then subsequently relied on that testimony in closing arguments.

"Before we turn to the petitioner's claims we set forth our standard of review for habeas corpus appeals. The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Questions of law and mixed questions of law and fact receive plenary review." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 174, 982 A.2d 620 (2009). The petitioner generally does not challenge the habeas court's factual findings. Thus, each of his claims raises either questions of law or mixed questions of law and fact, over which we exercise plenary review.

I

The petitioner first claims that the habeas court abused its discretion in denying his petition for certification to appeal from the denial of his habeas petition. Specifically, he argues that both the issue of procedural default and the issue of whether his due process rights were violated are debatable among jurists of reason, could be resolved in a different manner and are adequate to deserve encouragement to proceed further. We agree.

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . Id., 616, quoting *Lozada* v. *Deeds*, 498 U.S. 430, 432, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991). The required determination may be made on the basis of the record before the habeas court and the applicable legal principles. See *Simms* v. *Warden*, supra, 617. If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. Id., 612." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) *Johnson* v.

*Commissioner of Correction*, 285 Conn. 556, 564, 941 A.2d 248 (2008).

Turning to the petitioner's substantive claims, we have been unable to find any case in which this court or our Supreme Court has addressed whether a petitioner procedurally defaults a claim when appellate counsel withdraws, with permission of the court, after filing an *Anders* brief, having reviewed only the record, and does not investigate new information outside the record that could develop further a due process claim, or what constitutes cause and prejudice should such a default exist. Because these questions have not yet been addressed by the appellate courts of this state, we conclude that the petitioner's claim regarding procedural default is adequate to deserve encouragement to proceed further. See *Rodriguez* v. *Commissioner of Correction*, 131 Conn. App. 336, 347, 27 A.3d 404 (2011) (concluding that claim deserved encouragement to proceed further when no appellate case had decided precise issue), aff'd on other grounds, 312 Conn. 345, 92 A.3d 944 (2014); *Small* v. *Commissioner of Correction*, 98 Conn. App. 389, 391–92, 909 A.2d 533 (2006), aff'd, 286 Conn. 707, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

Additionally, as discussed more fully in parts II and III of this opinion, we agree with the petitioner's claims that he did not procedurally default his claim, that he alternatively established cause and prejudice, and that he was denied his due process rights when the prosecutor did not correct Ellis' false testimony and then argued to the jury after testimony favorable to the prosecution that Ellis had "everything to lose, nothing to gain . . . ." We, therefore, address the merits of the petitioner's claims.

II

The petitioner next claims that he did not procedurally default his due process claim. Specifically, he argues that the trial record was inadequate to raise the claim on direct appeal and that he did not fail to follow a firmly established and regularly followed state procedural requirement because appellate counsel was not required to investigate or augment the record. Alternatively, if procedural default is found, the petitioner claims that he established cause and prejudice for his default.

A

"A party in a habeas appeal procedurally defaults on a claim when he raises issues on appeal that were not properly raised at the criminal trial or the appeal thereafter. . . . Habeas, as a collateral form of relief, is generally available to litigate constitutional issues only if a more direct route to justice has been foreclosed through no fault of the petitioner." (Citations omitted;

internal quotation marks omitted.) *Salters* v. *Commissioner of Correction,* 141 Conn. App. 81, 87, 60 A.3d 1004, cert. denied, 308 Conn. 932, 64 A.2d 330 (2013). The reviewability of habeas claims not properly pursued on appeal is subject to the cause and prejudice standard. *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 132, 629 A.2d 413 (1993).

The petitioner's due process claim is axiomatically constitutional in nature. He argues, however, that because the record was inadequate to review his claim based on the trial court record and there is no firmly established and regularly followed procedural requirement for appellate counsel to investigate or augment the record, he did not procedurally default his claim. We note that the petitioner's trial counsel thoroughly cross-examined Ellis regarding the state's promise to him, to no avail, and that information regarding Ellis' sentencing only became available after the conclusion of the petitioner's criminal trial. Given the ambiguous and contradictory statements of the prosecutor regarding any promise to Ellis, we fail to see how the petitioner could "properly raise" his claim on appeal from the record. Our conclusion is bolstered by the fact that the petitioner's appellate counsel was granted permission by the Superior Court to withdraw because she concluded there were no nonfrivolous claims to raise on appeal. We, therefore, hold that the petitioner did not procedurally default his claim because his more direct route to justice via appeal was foreclosed through no fault of his own.

Additionally, although we observe that our precedent has established that constitutional claims that could have been raised on appeal are subject to procedural default; *Jackson* v. *Commissioner of Correction*, supra, 227 Conn. 132; one may question the application of the procedural default doctrine to due process claims under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its analogues, which also is well established in our precedent. See, e.g., *Salters* v. *Commissioner of Correction*, supra, 141 Conn. App. 87–91. Procedural default, being a prudential limitation, is really a form of judicial economy. See *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 447 n.18, 936 A.2d 611 (2007); see also *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 71, 136 A.3d 596 (2016) ("[t]he prudential considerations underlying the procedural default doctrine are principally intended to vindicate two concerns: federalism/comity and finality of judgments").

Our appellate courts have not yet carved out an exception for such claims as they have done for *Strickland*[8] claims. See *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 570–71. In *Johnson*, our Supreme Court held that "[i]f a petitioner can prove that his attorney's performance fell below acceptable stan-

dards, and that, as a result, he was deprived of a fair trial or appeal, he will necessarily have established a basis for cause and will invariably have demonstrated prejudice. . . . The similarity of the second part of the *Strickland* test . . . and of the prejudice prong of the cause and prejudice test of *Wainwright* [v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977)] makes a threshold showing of cause and prejudice unnecessary for ineffective assistance of . . . counsel claims. . . . [W]e conclude that it is simpler and more appropriate to move directly to the *Strickland* test. . . . There is no need to confuse this process by utilizing the cause and prejudice test." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 570–71. This exception makes more sense when one considers that ineffective assistance claims generally require the testimony of counsel, for which a habeas proceeding is better suited.

Our Supreme Court has recognized that the showing of prejudice under the procedural default doctrine "is the same showing of prejudice that is required for *Strickland* or *Brady* errors"; *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 85; and the United States Supreme Court has observed that "[c]ause and prejudice . . . parallel two of the three components of . . . *Brady* . . . . Corresponding to the second *Brady* component (evidence suppressed by the [s]tate), a petitioner shows cause when the reason for his failure to develop facts in state-court proceedings was the [s]tate's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the cause and prejudice requirement exists when the suppressed evidence is material for *Brady* purposes. . . . Thus, if [a petitioner] succeeds in demonstrating cause and prejudice, he will at the same time succeed in establishing the elements of his . . . *Brady* . . . due process claim." (Citations omitted; internal quotation marks omitted.) *Banks* v. *Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004).

We fail to see how the converse is not also true, namely, that the petitioner establishes cause and prejudice by establishing the suppression of material exculpatory evidence under *Brady* and its analogues. At least one federal Court of Appeals uses this approach. See *Akrawi* v. *Booker*, 572 F.3d 252, 261–62 (6th Cir. 2009). In *Akrawi*, the United States Court of Appeals for the Sixth Circuit upheld the District Court's decision to ignore procedural default and address the merits of the petitioner's due process claim "in the interest of judicial economy." (Internal quotation marks omitted.) Id., 261. Noting that "[t]he cause and prejudice standard tracks the last two elements of a *Brady* claim: suppression by the government and materiality"; (internal quotation marks omitted) id.; the Sixth Circuit opted to look "past procedural default to address the merits, because . . .

if [the petitioner] succeeds in showing suppression of favorable evidence material to guilt or innocence, will have necessarily shown cause and prejudice excusing his procedural default." (Internal quotation marks omitted.) Id., 261–62. We are not at liberty to overrule this court's or our Supreme Court's precedents applying the procedural default doctrine to due process claims under *Brady* and its analogues, and indeed hold that there was no procedural default in this case; however, we believe the prudential considerations underlying the doctrine would warrant "looking past procedural default to address the merits"; id., 261; of such claims.

B

Alternatively, even if we were to assume that procedural default had occurred, we conclude that the petitioner has established cause and prejudice.

"[A] petitioner must demonstrate good cause for his failure to raise a claim . . . on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . ." (Internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 71."The cause and prejudice requirement is not jurisdictional in nature, but rather a prudential limitation on the right to raise constitutional claims in collateral proceedings." (Internal quotation marks omitted.) Id.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that some interference by officials . . . made compliance impracticable, would constitute cause under this standard." (Internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, supra, 227 Conn. 137.

For a petitioner to demonstrate prejudice, he "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. . . . [T]he petitioner would have to demonstrate that, with the proper instruction, there was a substantial likelihood that the jury would not have found the petitioner guilty of the crime of which he was convicted. . . . Substantial likelihood or reasonable probability does not require the petitioner to demonstrate that the jury more likely than not would have

acquitted him had it properly been instructed. . . . This is the same showing of prejudice that is required for *Strickland* or *Brady* errors. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations omitted; internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 84–85.

1

We now proceed to our further analysis of the procedural default issue. The petitioner argues that there was cause for his procedural default because "[t]he factual basis for [his] claim was not reasonably available to [appellate] counsel, and it was the state's conduct at trial that made raising the claim on direct appeal impracticable." Specifically, the petitioner argues that it was reasonable for his appellate counsel to rely on the prosecutor's statements during the criminal proceedings denying that any consideration had been offered, to rely on the prosecutor to disclose all exculpatory materials and to rely on the prosecutor not to present false testimony or then to correct any false testimony. The petitioner claims that it was only when the prosecutor and Stawicki testified at the habeas trial that it became clear that Ellis' testimony was false because prior to their testimony, the prosecutor had repeatedly denied promising Ellis anything, despite the repeated requests for information by the petitioner's trial counsel about any discussions with or incentives offered to Ellis.[9]

The respondent counters that "all of the predicate facts necessary to litigate a *Giglio* claim[10] were available to the petitioner before appellate counsel withdrew from [the] case and long before the petitioner withdrew his appeal." (Footnote added.) In addition, the respondent argues that the state disclosed any exculpatory materials, and so there can be no cause attributable to the state's conduct.

In its memorandum of decision, the habeas court disagreed with the petitioner's argument that the evidence necessary to support his claim was not available at the time his direct appeal was pending. The court found that "[t]he evidence presented by the petitioner at the habeas trial that provides the basis for his claims . . . was known or knowable from November 23, 2005, until April 23, 2013. Given how long the appeal was pending before it was withdrawn, the petitioner could have filed, pursuant to Practice Book § 42-55, a petition[11] for a new trial based on newly discovered evidence. Section 42-55 expressly authorizes action on the petition for [a] new trial even though an appeal is pending. The record from any proceedings conducted by the criminal court, the correct forum for the petitioner's claims, could then augment the record of the direct appeal." (Footnote added.)

In looking at the habeas court's reasoning, we must

first conclude that it was error to suggest as support for a lack of cause that the petitioner could petition for a new trial. Because the respondent's return asserted only that the petitioner procedurally defaulted on the basis of his not having directly raised on appeal his due process claim, a fact the habeas court acknowledged just two paragraphs prior to its cause analysis, the court could not suggest then that the petitioner should have moved or petitioned for a new trial. A motion or petition for a new trial is not part of a direct appeal. See footnote 11 of this opinion. Although the court also cited *State v. Floyd*, 253 Conn. 700, 756 A.2d 799 (2000), in a footnote, for the proposition that the petitioner could have moved to augment the record on direct appeal, such a procedure is not necessary for a direct appeal.

In *Salters* v. *Commissioner of Correction*, supra, 141 Conn. App. 87–89, this court held that the petitioner procedurally defaulted his *Brady* claim because, at the time of his criminal trial, he and his trial counsel were aware of a cooperating witness' history of arrests that they claimed for the first time at the habeas trial the state had failed to disclose. Specifically, the petitioner's trial counsel discussed "at length" his theories as to the existence of the witness' records, but "he did not ask for an evidentiary hearing at that time." Id., 89. Counsel did not seek further disclosure from the state at trial, and the petitioner did not claim a *Brady* violation in his direct appeal. Id.

This case is distinguishable from *Salters* because the petitioner's appellate counsel could not have developed a due process claim without extrarecord information of which she was unaware. We note that the petitioner's appointed appellate counsel, a highly experienced appellate attorney, had only the record in front of her in determining to move to withdraw as counsel. *Anders* requires only that appellate counsel look to the entire record in deciding whether there are appealable issues. *Anders* v. *California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967). We conclude that it runs contrary to the spirit of *Anders* to then impose on appellate counsel the additional duty of investigating if there are also any possible claims outside of the record to determine if additional claims are viable.[12] See id.; see also *Banks* v. *Dretke*, supra, 540 U.S. 695–96 ("[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed" and "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process").

In *Strickler* v. *Greene*, 527 U.S. 263, 284–85, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the United States Supreme Court found unpersuasive the respondent warden's argument that the factual basis for the assertion

of a *Brady* claim was available through an examination of the cooperating witness' trial testimony coupled with a letter published in a local newspaper and that diligent counsel would have sought a discovery order from the state court. "Mere speculation that some exculpatory material may have been withheld [should not] suffice to impose a duty on counsel to advance a claim for which they have no evidentiary support." Id., 286.

We note that the *Anders* brief[13] filed by appellate counsel was thirty-five pages long and comprehensively addressed all possible claims emanating *from the record.*[14] This brief then had to be analyzed independently by the trial court before allowing appellate counsel to withdraw. See *Anders* v. *California*, supra, 386 U.S. 744. The trial court, in granting the motion to withdraw, implicitly then concluded that there were no nonfrivolous issues *in the record.*

Likewise, we cannot expect an incarcerated individual such as the petitioner, after appellate counsel has been permitted to withdraw by the Superior Court, to then be able to develop new claims from the confines of prison. Such expectations defy reason. Thus, we conclude that because the factual basis underlying the petitioner's due process claim was not fully available until after his appellate counsel, who had no duty to investigate it under *Anders*, moved to withdraw, such information was not reasonably available.[15] See *Waley* v. *Johnston*, 316 U.S. 101, 104–105, 62 S. Ct. 964, 86 L. Ed. 1302 (1942) ("The facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal. In such circumstances the use of the writ in the federal courts to test the constitutional validity of a conviction for crime . . . extends . . . to those exceptional cases where the conviction has been in disregard of the constitutional rights of the accused, and where the writ is the only effective means of preserving his rights.").

Our conclusion that the petitioner has established cause for any procedural default is further supported by precedent from the United States Court of Appeals for the Second Circuit. For example, in *United States ex rel. Washington* v. *Vincent*, 525 F.2d 262, 268 (2d Cir. 1975), cert. denied sub nom. *Bombard* v. *Washington*, 424 U.S. 934, 96 S. Ct. 1147, 47 L. Ed. 2d 341 (1976),[16] the court reversed the District Court's denial of the petitioner's petition for a writ of habeas corpus where the prosecutor knowingly used false testimony from a cooperating witness concerning any promises of leniency for the witness. The cooperating witness denied having received any consideration from the prosecutor in exchange for his testimony. Id., 262–64. In fact, the witness had told the petitioner that he had been promised leniency on a gun possession charge in consideration for his testimony. Id., 265. The petitioner informed his trial counsel, but the conversation was

not brought to the court's or the prosecutor's attention before or during trial, at which the petitioner was convicted on the underlying murder charge. Id. After the trial, the petitioner's trial counsel inspected the transcript of the cooperating witness' weapons possession proceedings. Id. At those proceedings, the prosecutor revealed that he had promised several times to "see what [he] could do to help [the witness]." (Internal quotation marks omitted.) Id. The petitioner then instituted a coram nobis proceeding in state court, at which the prosecutor "repeatedly insisted that no specific offer had been extended." (Emphasis omitted.) Id. After being confronted with the transcript of the dismissal of the witness' weapons charge indictment, however, he conceded that a promise had been made. Id. The court, thereafter, granted the writ of coram nobis. Id., 266. The Appellate Division of the New York Supreme Court reversed the granting of the writ of coram nobis, holding that, although the prosecutor had committed gross impropriety, any error was harmless because "the jury was made fully aware of [the witness'] prior criminal record, of the pending gun charge and of the fact that he had consumed a large quantity of alcohol on the day of the murder." (Internal quotation marks omitted.) Id. The New York Court of Appeals affirmed that decision on the ground that "the defendant and his counsel, with knowledge of the facts, stood silently by and did nothing themselves to remedy the situation . . . ." (Internal quotation marks omitted.) Id. The petitioner then petitioned for a writ of habeas corpus in the United States District Court. Id., 267. The District Court denied the petition for a writ of habeas corpus on the basis of the trial and coram nobis judge's finding that the evidence was sufficient to convict the petitioner even absent the cooperating witness' testimony. Id. The Second Circuit, thereafter, reversed the judgment of the District Court. Id. The Second Circuit determined, after its own review of the record, that the witness' testimony was "the coup de grâce, unequivocally placing [the petitioner] at the scene of the crime with the murder weapon in his pocket, the robbery proceeds in his hands, and a confession in his mouth." Id., 267–68. In contrast, the other witnesses' testimony "was far from overwhelming." Id., 267. The court also noted that the jury was deadlocked prior to finding the petitioner guilty and that, "[c]learly, it [was] reasonable to conclude that [the cooperating witness'] testimony tipped the balance . . . ." Id., 268. The court also held that "it would be inappropriate not to permit [the petitioner] to challenge the egregious and highly damaging prosecutorial misconduct solely because he and his lawyer may have failed to utilize all available means for exploring the prosecutor's highhandedness at the trial." Id. The court thought a different result might occur in a case "where the possible harm was less pronounced"; id.; but noted that "[t]he harm . . . was caused not so much by unawareness that [the witness'] testimony may

have been perjured as by inability to respond effectively in view of [the prosecutor's] silence." Id., 268 n.9.

Here, in the present case, the respondent similarly argues that the petitioner had all of the predicate facts available to him to raise his due process claim on direct appeal; however, much like in *Vincent*, the harm stemmed not from unawareness of the falsity of Ellis' testimony but from Ellis' truculence and the petitioner's inability to respond effectively in light of the prosecutor's silence. In addition, and also like *Vincent*, it was not until the prosecutor himself testified at the habeas trial that there was a complete factual record to prove the petitioner's claim. We also note that, as in *Vincent*, Ellis was the key witness who put the petitioner at the crime scene with the likely murder weapon, a revolver, in his hand. Thus, we are persuaded by the reasoning in *Vincent* that it would be inappropriate not to permit the petitioner to challenge the prosecutor's knowing use of Ellis' false testimony.[17]

Therefore, the petitioner established cause for any procedural default.

2

The petitioner also argues that he has established the prejudice necessary to overcome procedural default because his claimed due process violation by the state was material to his conviction. The respondent does not present any argument or citation that would counter this claim. In fact, in the respondent's brief, he unequivocally states that "[b]ased on [his] review of the trial record, the [respondent] concedes that if this court were to overturn the habeas court and find a *Giglio* violation, the prosecution's failure to correct Ellis' false testimony was material to the petitioner's convictions of murder and conspiracy to commit murder because the state's case was not strong without Ellis' testimony."[18] This concession of materiality also concedes the prejudice necessary to overcome procedural default. See *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 84–85. Although we are not bound by the respondent's legal conclusions, we agree that Ellis' testimony was material to the petitioner's convictions for murder and conspiracy to commit murder. Ellis' testimony was the only testimony that placed the petitioner at the crime scene with the likely murder weapon, a revolver, in his hand.[19]

The habeas court, however, found that the petitioner did not establish prejudice because Ellis was "extensively questioned by [the petitioner's trial counsel] about his possible motivations for testifying," and the trial judge's instructions to the jury also addressed those potential motivations.[20] The habeas court further found that the state had no obligation to correct Ellis' false testimony because the state disclosed to the defense its promise to make Ellis' sentencing judge aware of

his cooperation.

We will examine more fully the parameters of *Brady* materiality, particularly disclosure, in part III of this opinion, but we note that, although the petitioner's trial counsel indeed did question Ellis about his motivations, Ellis repeatedly stonewalled him. Trial counsel was unable to get Ellis to admit to the jury that he had some promise from the state regarding his cooperation. We do not know what more the petitioner's trial counsel could have done to present the state's promise to Ellis to the jury.[21] Thus, despite whatever awareness the petitioner might have had of the prosecutor's promise to Ellis, this situation is inapposite to that in which defense counsel is actually aware of false testimony and fails to bring it to either the jury's or the court's attention, which raises "the assumption . . . that he did so for strategic reasons," because when a "defendant [is] prevented from raising or pursuing the issue at trial by circumstances essentially beyond his control," that presumption of strategy is undermined. (Internal quotation marks omitted.) *United States* v. *Manual-Garcia*, 505 F.3d 1, 10–11 (1st Cir. 2007), cert. denied sub nom. *Villanueva-Rivera* v. *United States*, 553 U.S. 1019, 128 S. Ct. 2081, 170 L. Ed. 2d 819 (2008), citing *United States* v. *Iverson*, 648 F.2d 737, 739 (D.C. Cir. 1981). The court's jury instructions regarding witnesses' cooperation could not obviate the prejudice emanating from Ellis' false testimony. That is so because the jury did not hear at all about the state's promise to Ellis, however limited it was. Additionally, the prejudice was not obviated because the prosecutor's statements in closing arguments suggesting that Ellis had "everything to lose, nothing to gain," invited the conclusion that Ellis had no interest in the outcome of the case and this sharpened the prejudice of the testimony itself. Likewise, we are not convinced that the impeachment of Ellis through knowledge of his criminal convictions would suffice to mitigate any prejudice. In *Napue* v. *Illinois*, 360 U.S. 264, 270, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), the United States Supreme Court observed that it did "not believe that the fact that the jury was apprised of other grounds for disbelieving that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one." Therefore, we conclude that the petitioner has established the requisite prejudice to overcome any procedural default. We next address the merits of his due process claim.

### III

Finally, we address the petitioner's claims that his due process rights were violated, in contravention of *Napue* and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972),[22] when the state elicited false testimony from Ellis at the petitioner's criminal trial, failed to correct the false testimony it had elicited,

and then relied specifically on that false testimony during its closing argument in order to secure the petitioner's convictions. The respondent concedes both that Ellis' testimony was false and that it was material to the petitioner's convictions, but argues, nonetheless, that the prosecutor disclosed the full extent of the cooperation agreement on the record outside of the jury's presence, and, thus, that the prosecutor satisfied his due process obligations to the petitioner. We agree with the petitioner that the prosecutor's use of Ellis' false testimony coupled with his statements in summation suggesting Ellis had no interest in the outcome violated the petitioner's due process rights. The jury was entitled to know any interest Ellis might have in the outcome that might motivate his testimony.

### A

"The rules governing our evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in *Brady* v. *Maryland*, [supra, 373 U.S. 86–87], and we begin our consideration of the [petitioner's claim that his due process rights were violated] with a brief review of those principles. In *Brady*, the court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [prosecutor]. . . . The United States Supreme Court also has recognized [in *Napue* v. *Illinois*, supra, 360 U.S. 269] that [t]he jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . . Accordingly, *the Brady rule applies not just to exculpatory evidence, but also to impeachment evidence* . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . Because a plea agreement is likely to bear on the motivation of a witness who has agreed to testify for the state, such agreements are potential impeachment evidence that the state must disclose. . . .

"Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a

fair trial . . . . *United States* v. *Bagley*, [473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)]. In a classic *Brady* case, involving the state's inadvertent failure to disclose favorable evidence, the evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. *Bagley*'s touchstone of materiality is a reasonable probability of a different result, and the adjective [reasonable] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. . . .

"When, however, a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, *the materiality standard is significantly more favorable to the defendant.* [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States* v. *Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); accord *State* v. *Ouellette*, 295 Conn. 173, 186, 989 A.2d 1048 (2010). This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected; e.g., *Napue* v. *Illinois*, supra, 360 U.S. 269; and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt. . . . This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. *United States* v. *Agurs*, supra, 104 . . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is readily shown . . . such that reversal is virtually automatic . . . unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury." (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–73, 71 A.3d 512 (2013).

"In *Strickler* v. *Greene*, [supra, 527 U.S. 281–82], the United States Supreme Court identified the three essential components of a *Brady* claim, all of which must be established to warrant a new trial: The evidence at issue must be favorable to the accused, either because

it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either willfully or inadvertently; and prejudice must have ensued. . . . Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 717, 911 A.2d 1055 (2006).

"[A] trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error. . . . Finally, in the present case, we conduct the required independent review of the record . . . ." (Citation omitted; internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 264, 112 A.3d 1 (2015).

Because neither the petitioner nor the respondent disputes the finding[23] that Ellis' testimony concerning a promise to make his cooperation known to his sentencing judge was false,[24] which clearly was impeachment evidence, we need only determine if the improper elicitation of that testimony and reliance upon it materially prejudiced the petitioner. See *Giglio* v. *United States*, supra, 405 U.S. 153–55; see also *Napue* v. *Illinois*, supra, 360 U.S. 269–71.

As previously noted in part II B 2 of this opinion, the respondent concedes that "if this court were to . . . find a *Giglio* violation, the prosecution's failure to correct Ellis' false testimony was material to the petitioner's convictions of murder and conspiracy to commit murder because the state's case was not strong without Ellis' testimony." We conclude that such a due process violation exists.

In *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 361–62, our Supreme Court affirmed this court's determination that the state's failure to correct false and misleading testimony from a cooperating witness was material, entitling the petitioner, Sean Adams, to a new trial. At the petitioner's criminal trial, the cooperating witness had "testified falsely that he had not been promised any consideration on his then pending charges in two unrelated criminal cases in exchange for his testimony against the petitioner and the petitioner's codefendants." Id., 363. The witness in *Adams* also vastly inflated the length of his possible maximum sentence in his testimony, claiming he could face thirty-eight years when the sentencing judge had limited his sentence to four years. Id. The prosecutor did not correct the false testimony, apparently, because he was unaware of the agreement. Id. Prior to Adams' original criminal trial, the witness had pleaded guilty in his separate cases, and he accepted the plea offer of no more

than four years imprisonment. Id., 364. If he then cooperated with the state in Adams' case, however, the witness would have had the right to argue for a more lenient sentence. Id. After the witness testified in Adams' case, the prosecutor in the witness' case recommended to the sentencing judge that the court vacate the witness' guilty pleas on two of his charges and impose an unconditional discharge on a third because the witness had testified favorably in three cases, one of which involved Adams. Id., 364–66. The *Adams* petitioner then filed a petition for a writ of habeas corpus. Id., 363. In its memorandum of decision, the habeas court assumed that the witness' testimony was false and misleading, but concluded that the testimony was not material. Id., 366. On appeal to the Appellate Court, the respondent conceded that the state had failed to correct the witness' false testimony at Adams' criminal trial. Id., 367. The Appellate Court held that there was a reasonable likelihood that the witness' testimony could have affected the jury's verdict, and it reversed the judgment of the habeas court. Id. Noting that no weapon was ever recovered and that the only physical evidence connecting the petitioner to the crime scene was a yellow jacket, the significance of which depended on the cooperating witness' and his brother's credibility, our Supreme Court, after granting the respondent's petition for certification to appeal from the Appellate Court's decision, concluded that the state's case depended largely on the credibility of two witnesses, one of whom was the cooperating witness. Id., 374. After remarking on the inconsistencies in the testimony of the other witness; id., 374–80; and the lack of any depth in the testimony of the cooperating witness' brother; id., 380–81; our Supreme Court also concluded that the testimony of the cooperating witness was significant, as "was any evidence that could cast doubt on his credibility." Id., 381. The court observed that the witness' testimony was consistent with his police statements, that "[c]ross-examination . . . was extensive and focused [and that] . . . [h]e also was questioned about the relation between his eventual decision to testify and his pending criminal charges"; id., 381–82; however, he "effectively rebuffed efforts by defense counsel to demonstrate that he was motivated to testify against the petitioner and his codefendants by any promise or expectation of leniency." Id., 382. The court was not persuaded that the calling into question of the witness' credibility by other means could substitute for the knowledge that he had been promised leniency for his testimony against the petitioner. Id., 386. The court also noted that the prosecutor repeatedly endorsed the witness' credibility during rebuttal closing argument, suggesting that he "wouldn't lie in this situation" and that the witness was "not [t]here just to nail the guys we have on trial." (Internal quotation marks omitted.) Id., 387–88. Thus, because the state's case was not strong, resting entirely on the credibility of its witnesses, and the jury deliber-

ated for ten days before reaching its verdict; id., 389; the court in *Adams* was "unable to conclude that [the witness'] perjurious testimony was so relatively insignificant that the state's failure to correct it d[id] not warrant relief under the strict materiality standard applicable in [the] case," and it granted the petitioner a new criminal trial. Id., 390.

The court in *Adams* did not address the issue of disclosure because it clearly did not occur in that case, but, instead, the court only dealt with materiality. Setting aside the disclosure issue, which we address in part III B of this opinion, we conclude that Ellis' testimony was material.

Unlike *Adams*, the prosecutor in the present case was also the prosecutor in Ellis' guilty pleas after the petitioner's criminal trial. Thus, there could not be a logical claim that the prosecutor was unaware of the promises made to Ellis, because he promised to bring Ellis' testimony to the attention of the sentencing judge. Similar to *Adams*, however, Ellis denied having received any consideration, despite defense counsel's repeated efforts to get him to admit the benefits he would receive from the prosecutor for his testimony against the petitioner. The prosecutor in this case then used his closing argument to enhance Ellis' credibility by arguing that Ellis had everything to lose and *nothing to gain* and that he was "in the mix." He also claimed that he did not know if Ellis expected anything, even though he had told Ellis that the state would bring Ellis' testimony to the attention of his sentencing judge. At that point, Ellis already had testified in a manner favorable to the prosecution. He was also the only witness tying the petitioner to the murder scene at the time of the killing. He was also the only witness to place a revolver in the petitioner's hands at the time and place of the shooting. There was no physical evidence in this case that would tie the petitioner to the crime scene. In *Adams*, at least there was one piece of physical evidence, a yellow jacket. Here, the prosecutor knew that he had promised Ellis that he would bring the fact of his cooperation to the attention of his sentencing judge if he testified truthfully at the petitioner's criminal trial.

In addition, in the present case, the state's case arguably was weaker than it was in *Adams*.[25] As opposed to *Adams*, where there were at least two eyewitnesses, Ellis, who was not even an eyewitness to the shooting, was the only witness who placed the petitioner at the crime scene. He is also the only witness who put a revolver, which expert testimony established was the likely murder weapon, in the petitioner's hand. The respondent points out that Douglas also testified in a manner that implicated the petitioner; however, her testimony was based on an alleged admission to her by the petitioner. She was not an eyewitness to the murder.

She was unhappy with the petitioner for personal reasons; her testimony made clear that she was angry at the petitioner for alleged infidelities. One of her letters to him stated, "I will take your f-ing freedom you bitch." For these reasons, we conclude that there is a reasonable likelihood that Douglas' testimony alone would have been insufficient to convict the petitioner of murder and conspiracy to commit murder. When the issues with Douglas' testimony are considered with Ellis' tainted testimony, and the complete lack of physical evidence that would tie the petitioner to the crime scene, we conclude that there is a reasonable likelihood of a different result because Ellis' false testimony, or the reliance on it by the prosecutor in his closing argument, could have affected the verdict of the jury. See *Merrill* v. *Warden*, 177 Conn. 427, 431, 418 A.2d 74 (1979) ("The fact that [the witness] was a key witness made his credibility crucial to the state's case. In assessing his credibility the jury [was] entitled to know that he was testifying under false colors. Such knowledge could have affected the result."); *State* v. *Grasso*, 172 Conn. 298, 302, 374 A.2d 239 (1977) ("[w]hen a conviction depends entirely upon the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense since if they are not believed a reasonable doubt of guilt would be created"). Therefore, under *Adams*, the petitioner has established that Ellis' false testimony was material to his conviction.

B

Our inquiry, however, does not end with the determination that false material testimony was elicited at the petitioner's criminal trial. The respondent contends that because the extent of the state's agreement with Ellis was disclosed to the petitioner's criminal trial counsel, the state did not suppress exculpatory evidence and, thus, did not violate the petitioner's due process rights. Although the petitioner disagrees that the full extent of the state's agreement was disclosed, he also argues that such disclosure needed to be made *to the jury*. This disagreement as to what level of disclosure is required stems from a split in this court's precedent regarding whether, under *Hines* v. *Commissioner of Correction*, 164 Conn. App. 712, 138 A.3d 430 (2016), and *State* v. *Jordan*, 135 Conn. App. 635, 42 A.3d 457 (2012), aff'd in part, rev'd in part on other grounds, 314 Conn. 354, 102 A.3d 1 (2014), disclosure of an agreement between the state and a cooperating witness needs to be made only to the defendant or whether it also must be made to the jury. We conclude, however, that this is neither the time nor the case for us to decide between these precedents because we conclude that, under either the *Hines* or *Jordan* standard, the state violated the petitioner's due process rights.

1

In *Jordan,* the state had disclosed to both the trial

judge and defense counsel the nature of its deals with the cooperating witnesses before they testified at the defendant's trial. *State* v. *Jordan*, supra, 135 Conn. App. 658–61. Each witness then took the stand and both lied about whether they had been promised anything by the state. Id. The prosecutor failed to correct their testimony. Id., 659–61. On cross-examination, defense counsel tried to elicit from one witness whether the state had made a promise to him, which he denied, but then did not question the other witness. Id. This court in *Jordan* concluded that the prosecutor committed impropriety by failing to correct the testimony. Id., 666–67. Although the prosecutor had informed the trial court and defense counsel, the Appellate Court still found the disclosure to be inadequate. Id. "Given the witnesses' subsequent misleading testimony . . . this advance notice to the court and counsel outside the presence of the jury was inadequate, as the jurors could well have been left with the impression, created by [the witnesses'] testimony, that neither had any incentive to testify favorably for the state. Under these circumstances, we conclude that the prosecutor had a duty to correct the record before the jury." Id., 666–67. When this court went on to analyze the *Williams*[26] factors, however, it concluded, due to additional testimony and physical evidence that implicated the defendant, that the defendant was not harmed by the prosecutor's failure to correct the witnesses' misleading testimony. Id., 667–68. Our Supreme Court granted certification to appeal and affirmed in part this court's decision in *Jordan*. *State* v. *Jordan*, 314 Conn. 354, 358, 102 A.3d 1 (2014). As to the defendant's due process claim, however, the court disposed of that claim solely on the ground that the defendant was not harmed because there was "sufficient independent evidence of the defendant's guilt."[27] Id., 366. The court also stated clearly that "nothing in this opinion should be construed to suggest that we concur in the Appellate Court's determination that improprieties occurred." Id., 369 n.7.

Although disclosure of materially exculpatory evidence to defense counsel would suffice under *Brady*, and *Napue* and *Giglio* are subsets of *Brady*; see footnote 22 of this opinion; our review of our state and federal precedents imply that disclosure to the jury is required in the case of known, but uncorrected, false testimony. Our Supreme Court's first discussion of *Giglio* occurred in an opinion reversing a defendant's conviction and ordering a new trial where the defendant's sixth and fourteenth amendment rights to confront the witnesses against him were violated. *State* v. *Annunziato*, 174 Conn. 376, 379–80, 387 A.2d 566 (1978). This reversal stemmed from the related federal habeas corpus proceedings of the defendant's father, who was his codefendant. In *United States ex rel. Annunziato* v. *Manson*, 425 F. Supp. 1272, 1274–81 (D. Conn.), aff'd, 566 F.2d 410 (2d Cir. 1977), the United States District

Court granted a writ of habeas corpus for the petitioner father after our Supreme Court denied his direct appeal and denied his petition for certification to appeal from the dismissal of his habeas petition. The petitioner originally had been convicted of conspiracy to commit murder on the basis of the testimony from a cooperating witness, who had denied receiving any consideration from the state for his testimony. Id., 1274–75, 1278. Prior to his criminal trial, the petitioner filed discovery motions seeking exculpatory information or material, which the court granted, but the state represented that it had none. Id., 1277. After the petitioner was convicted, the cooperating witness testified in another trial, where the petitioner's trial counsel learned that the witness "had made a deal with the state and federal governments that, in return for his giving evidence at [the] petitioner's trial and others, [the] pending state felony charges against him would be dropped, he would receive leniency on a bank robbery charge and immunity from prosecution for crimes to which he confessed while supplying information to the government." Id. The District Court found "that the state's misbehavior in [the] case could have affected the outcome of the trial" because the cooperating witness "was the state's chief witness against [the petitioner]. His testimony was all that directly tied [the] petitioner to the shooting . . . ." Id., 1279. The court also found that the witness' credibility had been "subjected to considerable scrutiny," but that "testimony of the complete deal would not have been merely cumulative. . . . In the face of [the witness'] denial as to the existence of any promise and the suppression by the prosecution of the full terms of the deal, defense counsel's argument challenging [the witness'] motive and interest was reduced to speculation and inference." Id. The court also found that "if the full terms of the agreement had been presented accurately *to the jury*, that evidence would have created a reasonable doubt as to the petitioner's guilt."[28] (Emphasis added.) Id., 1280–81. The Second Circuit affirmed the District Court's decision and recognized the importance of disclosing any agreements to the jury as fact finder in *Annunziato* v. *Manson*, 566 F.2d 410, 414 (2d Cir. 1977). The court, citing *Agurs* and *Giglio*, held that "where a prosecution witness falsely denies the existence of a leniency agreement, there is no need to prove deliberate design to suborn or conceal perjury on the part of the prosecution. . . . In evaluating bias and interest, *the jury* should be informed that the witness hopes for leniency on current charges *and* that the prosecutor has a present leverage over the fate of the witness. A conviction on such testimony will stand, of course, but *the jury* is entitled to make its own assessment of the witness with all the cards on the table." (Emphasis altered.) Id.; compare with *State* v. *Hackett*, 182 Conn. 511, 520, 438 A.2d 726 (1980) (finding no error in failure to allow question regarding plea bargaining that occurred prior to plea agreement

because "[i]n contradistinction to *Annunziato* v. *Manson*, [supra, 412], the bargain that the witness had struck with the state *was fully disclosed to the jury*" [emphasis added]).

Our Supreme Court discussed these two *Annunziato* federal court opinions when deciding the direct appeal of the *Annunziato* petitioner's son in *State* v. *Annunziato*, supra, 174 Conn. 376. The charges against the son arose out of the same facts as the charges against the father. Id., 376–78. Although the court disposed of the appeal on the confrontation clause claim as independently relied on by the defendant's father in his federal habeas cases; see footnote 28 of this opinion; the court also discussed the parameters of the father's due process claim, noting that the Second Circuit found "that disclosure of the bargain *to the jury* would have created a reasonable doubt as to [the petitioner father's] guilt [and] concluded that his due process rights had been violated under the principles of" *Brady, Giglio* and *Agurs*. (Emphasis added.) Id., 379–80.

We note that although *State* v. *Annunziato*, supra, 174 Conn. 376, has not been cited for the proposition that disclosure under *Giglio* means disclosure to the jury, it is not an outlier in this state's jurisprudence declaring as much. See *Merrill* v. *Warden*, supra, 177 Conn. 430–31 (petition for writ of habeas corpus granted where jury not made aware of nature of witness' deal with prosecutor); see also *State* v. *Paradise*, 213 Conn. 388, 400, 567 A.2d 1221 (1990) ("[t]he thrust of *Giglio* and its progeny [is] to ensure that the jury knows the facts that might motivate a witness in giving testimony" [internal quotation marks omitted]), abrogated in part on other grounds by *State* v. *Skakel*, 276 Conn. 633, 693, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

*Jordan* and the *Annunziato* trio of cases accord well with *Napue* itself. In *Napue* v. *Illinois*, supra, 360 U.S. 267–72, the United States Supreme Court reversed the denial of the petitioner's postconviction habeas petition where the prosecutor both elicited and failed to correct the false testimony of a cooperating witness who had testified against the petitioner. The court in *Napue* was unpersuaded that the petitioner's criminal trial was fair because the jury learned of other grounds for disbelieving the witness, and noted that "[h]ad *the jury* been apprised of the true facts . . . it might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the very representative of the [s]tate who was prosecuting the case in which [the witness] was testifying, for [the witness] might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration." (Emphasis added.) Id., 270. The court in *Napue* also observed that the final testimony of the witness that the jury heard was whether he

had been promised any consideration for his testimony, which the court concluded meant that the prosecutor must have thought it was important to establish before the jury.[29] Id., 270–71.

Later, in *Giglio* v. *United States*, supra, 405 U.S. 150–55, the United States Supreme Court extended *Napue* to include the situation where the lead prosecutor is unaware that a second prosecutor has promised the cooperating witness consideration for his testimony, and then the witness lies about such consideration at trial. The court noted that the District Court "proceeded on the theory that even if a promise had been made by [the second prosecutor] it was not authorized and its disclosure *to the jury* would not have affected its verdict." (Emphasis added.) Id., 153. The court reversed, stating that "neither [the second prosecutor's] authority nor his failure to inform his superiors or associates [was] controlling." Id., 154. In discussing the materiality of the witness' testimony, the court reasoned that "the [g]overnment's case depended almost entirely on [the witness'] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The witness'] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility *and the jury was entitled to know of it*." (Emphasis added.) Id., 154–55.

As was the case in *Giglio*, we cannot help but observe that the state's case was also almost entirely dependent on Ellis' testimony. His credibility, therefore, was important, and evidence of his promise from the prosecutor would be relevant to his credibility. It bore on whether he had anything to gain by his testimony. Therefore, the jury was entitled to know of it.[30]

Under the *Jordan* standard, it is crystal clear that the prosecutor failed to disclose his promise to Ellis to the jury or to correct what the habeas court found and the respondent conceded was Ellis' false testimony to the jury. *Jordan* and its antecedents would require that the jury be made aware of the agreement. That did not happen here. Although the prosecutor disclosed his promise to Ellis to the defense, "[t]he [petitioner] gains nothing, however, by knowing that the [state's] witness has a personal interest in testifying unless he is able to impart that knowledge to the jury." *United States* v. *Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977); see also *Alcorta* v. *Texas*, 355 U.S. 28, 31, 78 S. Ct. 103, 2 L. Ed. 2d 9 (1957) (knowing use of false testimony offends due process because of false impression given to jury); *Sivak* v. *Hardison*, 658 F.3d 898, 909 (9th Cir. 2011) ("It is irrelevant whether the defense knew about the false testimony . . . because defendants [cannot] waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the govern-

ment to protect the integrity of the court and the criminal justice system. . . . Whether defense counsel is aware of the falsity of the statement is beside the point." [Citations omitted; internal quotation marks omitted.]).

2

On the other hand, if the standard for disclosure, instead, is governed by *Hines*, the level of disclosure required is merely that the state makes defense counsel aware of the agreement.[31] See *Hines* v. *Commissioner of Correction*, supra, 164 Conn. App. 726. In *Hines*, the petitioner claimed that the state failed to disclose that it had made promises to a codefendant in exchange for his cooperation. Id., 720. The state denied any such promises, but this court held that the state had promised to remain silent at the codefendant's sentencing and to convey to the judge his cooperation. Id., 725. Nevertheless, the court concluded that because the prosecutor told defense counsel, albeit casually, that this was the extent of the agreement, a disclosure had been made, and, thus, the state was not required to correct the codefendant's testimony. Id., 728.

Here, the petitioner and the respondent disagree about whether the disclosure to defense counsel was adequate to satisfy the state's obligation under *Brady*. We must observe that the prosecutor initially denied that any promise had been made to Ellis. It was not until the trial court stated that, in the past, prosecutors would make a witness' cooperation known to the sentencing judge, and then asked the prosecutor if that was the case here, that the prosecutor acknowledged what he had promised to Ellis. Absent the trial court's question, there would have been absolutely no disclosure of any kind on the state's part.[32]

Assuming that the prosecutor satisfied his disclosure requirement under *Hines*, we conclude that the petitioner still was harmed when the state bolstered Ellis' testimony during closing and rebuttal arguments. As we have noted, the prosecutor stated that Ellis "wanted to get [his testimony] off his chest. He knew and knows that his statements put him in the mix." He also argued that Ellis "had everything to lose, nothing to gain, by giving these statements," and that Ellis "has been charged with this crime, too. And his position is he's only the driver, he had nothing to gain by giving these statements. He, clearly, said he wasn't made any promises. Does he expect something? That's in his mind. I don't know. But the reality is: he is in the mix."

In *Hines*, however, there is nothing in the decision indicating that the prosecutor obscured the witness' interest in the outcome during summation. Likewise, two recent habeas appeals arising out of the same crime, *Gomez* v. *Commissioner of Correction*, 178 Conn. App. 519, 176 A.3d 559 (2017), cert. granted, 328 Conn. 916,

180 A.3d 962 (2018), and *Brown* v. *Commissioner of Correction*, 179 Conn. App. 358, 179 A.3d 794, cert. denied, 328 Conn. 919, 181 A.3d 91 (2018), do not involve a scenario where the prosecutor bolstered the cooperating witnesses' false testimony about no promise when each witness, in fact, did have an interest in the outcome of the case.

In *Gomez*, the petitioner claimed that agreements between the state and the witnesses to bring their cooperation to the attention of their sentencing judge went undisclosed. *Gomez* v. *Commissioner of Correction*, supra, 178 Conn. App. 534. The habeas court found that at least one of the defense attorneys was aware of the agreement. Id. Citing *Hines*, this court rejected the claim of nondisclosure on the basis of the habeas court's finding that the defense attorney was aware of the arrangement. Id., 535–36. The petitioner in *Gomez* also argued that his due process rights were violated when the witnesses' false testimony was presented at his criminal trial. Id., 538. Although noting the tension between *Jordan* and *Hines*, this court held that because the agreements were disclosed, the state was not required to correct the false testimony. Id., 540–41. In *Brown*, this court rejected the same claims the petitioner in *Gomez* made, namely, that the state failed to disclose its agreements with the witnesses. *Brown* v. *Commissioner of Correction*, supra, 367–68. In both cases, this court also rejected the petitioners' arguments that the state failed to disclose impeachment evidence of the witnesses relating to how the state assisted in reducing their bonds. Id., 368–73; *Gomez* v. *Commissioner of Correction*, supra, 536–38. In *Gomez*, this court held that because the transcripts were available to the petitioner, there was no failure to disclose. Id. In *Brown*, however, this court held that "the petitioner did not present evidence at his habeas trial that compelled a finding that the state reached an agreement" with the witnesses respecting their bond hearings. *Brown* v. *Commissioner of Correction*, supra, 373. We, therefore, distinguish *Hines*, *Gomez* and *Brown* from the present case because none of those cases involved the knowing use of false testimony by the prosecutor in closing argument.

Our state courts have not addressed a situation where an agreement concerning a cooperating witness and the state was disclosed to the court and defense counsel, but the prosecutor nonetheless argued that the cooperating witness had everything to lose and nothing to gain in closing and rebuttal arguments. However, multiple federal Courts of Appeals have addressed similar situations. "Standing alone, a prosecutor's comments upon summation can 'so [infect] a trial with unfairness as to make the resulting conviction a denial of due process.'" *Jenkins* v. *Artuz*, 294 F.3d 284, 294 (2d Cir. 2002),[33] quoting *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).

In *Jenkins*, the Second Circuit observed that the prosecutor in that case bolstered her witness' credibility in closing arguments "by falsely suggesting the absence of a deal between [a cooperating witness] and the prosecution." *Jenkins* v. *Artuz*, supra, 294. The prosecutor claimed that she had never met the witness prior to trial, and, "[n]oting that there was no bad blood between [the witness] and the defendant . . . asked the jury to conclude that [the witness] had no reason to lie." (Internal quotation marks omitted.) Id. The court held that the prosecutor's "attempt to hide [the witness'] plea agreement from the jury and to use the false impression of its absence to bolster his credibility [left the court] with no doubt that [the prosecutor's] behavior violated [the petitioner's] due process rights." Id. The Second Circuit tempered this holding, stating that it "need not determine whether [the prosecutor's] summation independently abridged [the petitioner's] due process rights. It plainly sharpened the prejudice resulting from the use of [the witness'] initial untruthful testimony. The advocacy shown in the record . . . has no place in the administration of justice and should neither be permitted nor rewarded." (Internal quotation marks omitted.) Id., 294–95. Notably, the prosecutor in *Jenkins* acknowledged to the trial court that the state and the cooperating witness "had entered a plea agreement, as a condition of which he had agreed to cooperate and testify truthfully and fully, and that she expect[ed] it [would] come out on direct [examination]."[34] (Internal quotation marks omitted.) Id., 287.

In a prior case, *DuBose* v. *Lefevre*, 619 F.2d 973, 974–79 (2d Cir. 1980), the Second Circuit reversed the District Court's denial of a petition for a writ of habeas corpus where a cooperating witness falsely denied having received consideration from the prosecutor and the prosecutor then argued in summation that the witness had made no deal with the state, "but had chosen to testify to the truth with knowledge that it could only lead to continuation of her existing jail confinement." In fact, the cooperating witness had made a deal with the prosecutor, which came out during her plea hearing four days after the petitioner had been convicted. Id., 975–76. The petitioner then filed a motion to set aside the verdict on the basis of newly discovered evidence because of prosecutorial misconduct. Id., 976. The trial court found that no deal had been struck between the witness and the prosecutor, which the Appellate Division affirmed, and leave to appeal to the New York Court of Appeals was denied. Id., 977. The petitioner then applied for a writ of habeas corpus in the federal District Court, which denied the petition. Id. On appeal, the Second Circuit reversed, holding that "[t]he [s]tate's attempt to reconcile its evidence at [the petitioner's] trial that it had not offered [the witness] any kind of deal or any kind of promise or anything in exchange for her testimony with its repeated flat statements at

the [the witness'] plea hearing that it made an agreement . . . long before the murder trial started [to recommend] acceptance of the misdemeanor plea strains credulity almost to the breaking point." (Internal quotation marks omitted.) Id., 978. Holding that an agreement indeed had been made, which was not made known *to the jury*, and that the jury could have rejected the witness' testimony on that basis, the court concluded that "[t]he fact that the promise may not have taken a specific form did not allow the prosecution to avoid disclosing *to the jury* the fair import of its understanding with the witness when the question arose during cross-examination and redirect." (Emphasis added.) Id., 978–79. The court then held that the petitioner was harmed because without the cooperating witness' testimony, the state had virtually no case.[35] Id., 979. Concluding that, under *Giglio*, the jury was entitled to know of the prosecutor's deal with the cooperating witness, the court reversed the judgment of the District Court with instruction to grant the writ. Id.

We are persuaded by the Second Circuit's reasoning that any knowledge by the court or defense counsel through disclosure of a plea agreement can be thwarted by the prosecutor's examination of a witness or closing arguments, which requires reversal. See *Jenkins* v. *Artuz*, supra, 294 F.3d 295–96; *United States* v. *Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) ("if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" [internal quotation marks omitted]);[36] *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 372 ("because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is 'readily shown' . . . such that 'reversal is virtually automatic'" [citation omitted]). We, therefore, conclude that, even to the extent that the petitioner's trial counsel was aware of the state's agreement with Ellis, which would satisfy the disclosure requirement of *Hines*, such a disclosure was effectively negated by the prosecutor's harmful bolstering of Ellis during closing arguments. We note that *Jenkins* and *DuBose* are not outliers, and the Second Circuit is not the only federal court of appeals to rule in this manner.[37] See *United States* v. *Stein*, 846 F.3d 1135, 1147 (11th Cir.) ("where the government not only fails to correct materially false testimony but also affirmatively capitalizes on it, the defendant's due process rights are violated despite the government's timely disclosure of evidence showing the falsity"), cert. denied,      U.S.    , 138 S. Ct. 556, 199 L. Ed. 2d 436 (2017); *Shih Wei Su* v. *Filion*, 335 F.3d 119, 127–30 (2d Cir. 2003) (sufficient prejudice found where witness lied about not having been promised anything in exchange for testimony, lie went uncorrected, and prosecutor bolstered witness' credibility in summation, despite different prosecutor having made deal with witness); *DeMarco* v. *United*

*States*, 928 F.2d 1074, 1077 (11th Cir. 1991) ("the prosecutor's argument to the jury capitalizing on the perjured testimony reinforced the deception of the use of false testimony and thereby contributed to the deprivation of due process"); *Brown* v. *Wainwright*, 785 F.2d 1457, 1464 (11th Cir. 1986) ("[t]he government has a duty not to exploit false testimony by prosecutorial argument affirmatively urging to the jury the truth of what it knows to be false"); *United States* v. *Sanfilippo*, supra, 564 F.2d 179 (reversal merited when government "not only permitted false testimony of one of its witnesses to go to the jury, but argued it as a relevant matter for the jury to consider").[38] We conclude that these cases accord well with United States Supreme Court precedent. See *United States* v. *Agurs*, supra, 427 U.S. 103 ("the [United States Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair"); *Miller* v. *Pate*, 386 U.S. 1, 7, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967) ("[T]he [f]ourteenth [a]mendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. . . . There has been no deviation from that established principle. . . . There can be no retreat from that principle here." [Citations omitted.]); *Mooney* v. *Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935) (Due process "is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a [s]tate has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a [s]tate to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.").

Given the circumstances of this case, the promise between Ellis and the prosecutor as disclosed was not necessarily something that, at the time, would have been favorable to the petitioner. Ellis had not testified at that point. It was possible that he would testify placing the petitioner at the crime scene, which ultimately he did, but it also was possible that he would recant his pretrial statements to police, as witnesses sometimes do. See *State* v. *Whelan*, 200 Conn. 743, 746, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Once Ellis had testified, however, and did not recant his statements, but, indeed, inculpated the petitioner, it would have been clear then to the prosecutor that the state's agreement with Ellis to bring his level of cooperation to the sentencing judge was favorable to Ellis. The prosecutor's closing and rebuttal arguments, therefore, could not fairly suggest to the jury, as did the prosecutor, that Ellis had everything to lose and nothing to gain.[39] At that point, Ellis could have expected to have advanced beyond mere

hope to an expectation of some favorable treatment in his own case. Such information should have been made known to the jury so that, in weighing the testimony of Ellis, it could have weighed any potential effect that the promise of the prosecutor to bring Ellis' cooperation, at that point in a favorable manner, to the attention of the sentencing judge might have had on Ellis' testimony. For the prosecutor to argue that Ellis had everything to lose and nothing to gain when Ellis had testified favorably for the prosecution and had been promised that his testimony would be disclosed to his sentencing judge cannot be justified.[40]

C

Finally, we address the respondent's argument that should we find a due process violation, we, nonetheless, should uphold the petitioner's separate conviction on the tampering with a witness charge. The respondent contends that none of the evidence emanating from Ellis' testimony had any bearing on the tampering charge. The petitioner argues that the conviction of tampering "is buoyed by the assumption that the petitioner is guilty" of the murder and conspiracy to commit murder charges. We agree with the respondent.

In order to be convicted of tampering with a witness, the state must prove that a defendant, "believing that an official proceeding is pending or about to be instituted . . . induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding." General Statutes § 53a-151 (a).

In the petitioner's criminal trial, evidence was introduced of letters the petitioner had sent to Douglas. In one letter to Douglas, the petitioner wrote: "If anybody come trying to talk to you to death like you know me, and, shit, of course you know me and what not, but *you don't tell nobody that you don't know shit and don't want to* . . . ."[41] (Emphasis added.) In another letter, the petitioner wrote that "I'm schooling you on keeping your head right . . . ."

Given the elements required to prove tampering with a witness, we conclude that the jury reasonably could have found that the petitioner attempted to induce Douglas to withhold testimony. Despite the petitioner's argument that the conviction is "buoyed" by his other convictions and Ellis' false testimony regarding them, tampering with a witness can be established even absent other convictions. See *State* v. *Gethers*, 197 Conn. 369, 370, 497 A.2d 408 (1985). We, therefore, conclude that Ellis' false testimony was not material to the tampering with a witness charge or conviction.[42]

The judgment is reversed in part and the case is remanded with direction to render judgment granting the petition for a writ of habeas corpus, vacating the petitioner's underlying convictions under §§ 53a-54 and

53a-48 and ordering a new trial on those offenses; the judgment is affirmed as to the petitioner's underlying conviction under § 53a-151.

In this opinion the other judges concurred.

[1] See *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

The petitioner's claim has been styled by the parties and the habeas court as a "*Brady*" claim, a "*Giglio*" claim, a "*Napue*" claim and a "due process" claim. Noting that there are some subtle differences among these cases, they are nonetheless often conflated. See footnote 22 of this opinion. Recognizing these subtleties, we use the term "due process" claim wherever possible in this opinion, although our discussion of the parties' briefs, the habeas court's memorandum of decision and the various precedents often dictates the use of one of the other terms.

[2] Specifically, the petitioner was charged with murder in violation of § 53a-54, conspiracy to commit murder in violation of §§ 53a-48 and 53a-54, and tampering with a witness in violation of § 53a-151.

[3] Dennis Paris, who was shot at the same time as Williams-Bey, testified that while he and the petitioner were being held in nearby parts of the courthouse, he told the petitioner that "[y]ou all supposed to know who you all shooting," to which the petitioner replied, "I didn't even know you was there . . . ." We do not believe that this cryptic and ambiguous statement places the petitioner at the crime scene, as did the testimony of Ellis and Douglas, especially because, according to Paris, the petitioner also told Paris that he did not shoot him.

[4] Bennett, who was tried separately, apparently was acquitted of all charges.

[5] See *Anders* v. *California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).

[6] Although Ellis originally was charged with conspiracy to commit murder, assault in the first degree, conspiracy to commit assault in the first degree and tampering with a witness, all of the charges, except assault in the first degree, were dropped.

[7] General Statutes § 53a-39 (b) provides: "At any time during the period of a definite sentence of more than three years, upon agreement of the defendant and the state's attorney to seek review of the sentence, the sentencing court or judge may, after hearing and for good cause shown, reduce the sentence, order the defendant discharged, or order the defendant discharged on probation or conditional discharge for a period not to exceed that to which the defendant could have been originally sentenced."

[8] *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[9] It was only after the trial court itself asked the prosecutor specifically if he informed Ellis that he would make his level of cooperation known to the sentencing judge that the prosecutor confirmed any level of discussion with Ellis.

[10] See *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). A *Giglio* or *Napue* claim is one in which a defendant claims a violation of his due process right to a fair trial when a necessary cooperating witness' false testimony concerning any promise of consideration from the government for his testimony goes uncorrected before the jury. See id., 153–55; *Napue* v. *Illinois* 360 U.S. 264, 269–72, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). Both are considered subsets of *Brady*. See footnote 22 of this opinion.

[11] Although the habeas court referred to Practice Book § 42-55 as providing for a "petition" for a new trial, that section concerns a "motion" for a new trial. A "petition" for a new trial, which is commenced by a separate civil action, is governed by General Statutes § 52-270 and may be granted for, inter alia, "the discovery of new evidence . . . ." Because it is the Superior Court that grants a petition for a new trial, such a petition is clearly not part of an appeal. In addition, the statute governing the appeal rights of defendants, General Statutes § 54-95, makes clear that a defendant "may be relieved by appeal, petition for a new trial or writ of error . . . ." The disjunctive "or" in the statute further crystalizes our conclusion that a petition for a new trial is not part of an appeal.

Additionally, the rules of practice concerning motions for a new trial, Practice Book §§ 42-53 to 42-55, are contained in the chapter pertaining to trial procedure in criminal matters before the Superior Court, not in the

chapter containing our rules of appellate procedure. Therefore, we conclude that a motion for a new trial, likewise, is not part of an appeal.

[12] The respondent cites to, but then does not explain, a line in *Crawford* v. *Commissioner of Correction*, supra, 294 Conn. 194, where our Supreme Court stated that "attorney error short of ineffective assistance of counsel does not adequately excuse compliance with our rules of . . . procedure." (Internal quotation marks omitted.) Given the requirements of *Anders*, we would be hard-pressed to find ineffective assistance were it claimed, and, thus, we conclude that this quote is not relevant to the present case.

[13] The *Anders* brief was not in the habeas trial record, but was included in the petitioner's trial court file. We have read the brief and take judicial notice of its contents. See *Grant* v. *Commissioner of Correction*, 87 Conn. App. 814, 817, 867 A.2d 145, cert. denied, 274 Conn. 918, 879 A.2d 895 (2005).

[14] The petitioner's criminal trial record shows that the prosecutor denied having made any deal with Ellis, though he eventually admitted that he had told Ellis that his sentencing judge would be told that Ellis gave a statement. Whatever then occurred between the prosecutor and Ellis after the trial does not appear in the record.

[15] We reject any notion that counsel "should have known of such claims through the exercise of reasonable diligence." See, e.g., *Stockton* v. *Murray*, 41 F.3d 920, 925 (4th Cir. 1994), cert. denied sub nom. *Stockton* v. *Angelone*, 515 U.S. 1187, 116 S. Ct. 37, 132 L. Ed. 2d 918 (1995). *Anders* requires that appellate counsel look to the record, nothing more. See *Anders* v. *California*, supra, 386 U.S. 744. We conclude that it would be unreasonable to expect appellate counsel who had nothing to do with the trial to look beyond the record for colorable claims on appeal. See *Amiel* v. *United States*, 209 F.3d 195, 198 (2d Cir. 2000) (appellant's claim preserved from procedural default where appellant was represented by new counsel on direct appeal and claim was based on events outside trial record).

[16] Although *Washington* predates *Wainwright* v. *Sykes*, supra, 433 U.S. 72, its holding allowing the petitioner to make his due process claim despite possible procedural shortcomings is directly applicable and not in conflict with *Wainwright*.

[17] The Second Circuit did think that the petitioner's trial counsel in *Vincent* had other alternatives, namely, that he could "have requested a side-bar conference or an in camera proceeding at which he could put the matter of [the prosecutor's] promises directly to the prosecutor." *United States ex rel. Washington* v. *Vincent*, supra, 525 F.2d 268 n.8. There are two reasons why we are not swayed by this dictum. First, the respondent's return in this case claimed only procedural default through the petitioner's failure to directly appeal his due process claim, so anything that the petitioner's trial counsel could have done at trial simply is irrelevant. Second, in *Vincent*, the petitioner learned of the witness' deal from the witness himself, unlike in this case where the prosecutor responded affirmatively to the trial court's question regarding whether he would make Ellis' sentencing judge aware of his statement. Because we also conclude that the petitioner's trial counsel exhausted his available means of exposing the prosecutor's promise to Ellis; see footnote 21 of this opinion; we fail to see another way that the jury would have learned of Ellis' uncorrected false testimony. And, unlike in *Vincent*, the prosecutor in this case bolstered Ellis' credibility by suggesting to the jury that Ellis had nothing to gain, sharpening the already substantial prejudice.

[18] It bears mentioning that the court found Ellis' testimony to be false, and the respondent also conceded its falsity during oral argument before this court.

[19] Bennett, the other man charged with and tried for Williams-Bey's murder, did not testify at the petitioner's criminal trial.

[20] In a comprehensive charge, the trial court instructed the jury concerning Ellis' testimony as follows: "[I]n weighing the testimony of Benjamin Ellis, who is, as I mentioned, a self-confessed criminal, you should consider that fact. It may be that you would not believe a person who's committed a crime as readily as you would believe a person of good character. In weighing the testimony of an accomplice who has not yet been sentenced, or whose case, actually, to say correct[ly], has not yet been disposed of, it's still pending; you should keep in mind that he *may* be looking for some favorable treatment in the sentence or disposition of his own case. Therefore his testimony *may* have been colored by that fact. You must look, with particular care, at the testimony of an accomplice and scrutinize it very carefully before you accept it. There are many offenses that are of such character that the only persons capable, however, of giving useful testimony are those

who themselves were implicated in the crime. It's for you to decide . . . what credibility you will give to Mr. Ellis, who has admitted his involvement in criminal wrongdoing, whether you will believe or disbelieve the testimony of Mr. Ellis, who, by his own admission, contributed to the crime charged by the state here. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you. You had an extensive opportunity to observe his demeanor on the stand. He was cross-examined extensively. His testimony, I must caution you, must be scrutinized carefully and if you find that he . . . intentionally assisted in the commission or aided in the commission of the offense or offenses, [with] which [the petitioner] is charged, you must be particularly careful in regard to his testimony. In weighing Mr. Ellis' testimony you should bear in mind that his charges arising from this incident are still pending. The ultimate charges he will face have not yet been determined. They *may* be the same. They *may* be changed. You should keep in mind that he *may* be looking for favorable treatment in the disposition of his own case. You may consider whether his testimony was colored by that fact and look, with particular care, upon his testimony and scrutinize it very carefully before you accept it. In addition, in considering his credibility, you may consider any motive he had for testifying falsely to implicate the accused. While Mr. Ellis has been charged with murder and conspiracy to commit murder of Kendall Williams-Bey, he's not yet been tried on those charges. In viewing this, you may consider the fact that the state's attorney *may*, without approval of the court, [change the] charges or possibly even drop [them] if the state's attorney states a reason for that . . . on the record. I have no indication, *nor is there any evidence, that that will be done.* But Mr. Ellis was cross-examined on those issues in general and in particular and you got the opportunity to evaluate his credibility. You may consider all of this in deciding whether Mr. Ellis has any interest in the outcome of this case or any bias . . . or prejudice concerning any party or any matter involved in the case." (Emphasis added.)

We note that the trial court stated that there was no evidence that the prosecutor would change or drop any charges in Ellis' pending case. At the later trial of this habeas petition, it became evident that the prosecutor dropped or reduced Ellis' charges, a fact that obviously is not in the petitioner's criminal trial record.

[21] In his brief, the respondent highlights the attempt of the petitioner's trial counsel to impeach Ellis with his false testimony. At oral argument, the respondent's counsel was asked what else the petitioner's trial counsel could have done when Ellis persisted with false testimony in light of the prosecutor's silence. Counsel argued that the petitioner's trial counsel could have asked for a stipulation or an instruction, or could have presented Ellis with the transcript of the proceeding in which the prosecutor put the agreement on the record.

Given the prosecutor's persistent denial of any promise, it is unlikely that he would have stipulated to the fact that Ellis' testimony on the issue was false, particularly in light of his later capitalization on Ellis' lie in closing argument. We similarly are unconvinced that any requested instruction would have been probable because it would have required the trial court to take judicial notice of the truth of a statement that it could not validate, as the court was not a witness to the promise made to Ellis.

[22] In his operative petition, the petitioner framed his claim as follows: "Pursuant to the fifth, sixth and fourteenth amendments [to] the United States constitution, article first, §§ 8 and 9, of the Connecticut constitution, [*Brady*] and [*Adams*], the petitioner's constitutional rights were violated because the prosecuting authority failed to correct [the] false testimony of Benjamin Ellis and/or failed to disclose exculpatory materials."

At the habeas trial and in his appellate briefs, the petitioner referred to his claim as a violation of *Brady*, *Napue* and *Giglio*. We observe that, although *Napue* predated *Brady*, *Napue* and *Giglio* are often conflated with *Brady*. See *United States* v. *Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (*Napue* and *Giglio* fall within *Brady* rule). We, thus, take the petitioner's claim of a *Brady* violation to include references to *Napue* and *Giglio*, especially in light of his claim in his operative petition that Ellis testified falsely. See *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 363 n.6, 71 A.3d 512 (2013). Regardless, *Adams* incorporated *Brady*, *Napue* and *Giglio* into its framework, so a claim of an *Adams* violation would necessarily include the full breadth of the three cases, among others.

[23] The habeas court's finding of the falsity of Ellis' statement is a factual

determination subject to clear error review. See *State* v. *Satchwell*, 244 Conn. 547, 561–62, 710 A.2d 1348 (1998). We find no clear error in this finding. In addition, the respondent concedes that the finding as to the falsity of Ellis' testimony was not clearly erroneous.

[24] The petitioner and the respondent disagree on when the petitioner and his various counsel learned about the falsity of Ellis' testimony, but for reasons that will become clearer in our discussion, such a distinction is irrelevant.

[25] The respondent concedes that the state's case against the petitioner was not strong without Ellis' testimony.

[26] *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987).

[27] Our Supreme Court concurred with this court's determination that there was "no reasonable likelihood that the potentially misleading testimony could have affected the judgment of the jury" because "there was overwhelming evidence of the defendant's guilt even without the testimony of [the witnesses]." *State* v. *Jordan*, supra, 314 Conn. 371–72. Here, Ellis' testimony placing the petitioner at the scene of the killing with the likely murder weapon in his hand was vital to the petitioner's conviction, so we cannot similarly say that the jury was unaffected by his testimony and the prosecutor's subsequent reliance on it during closing argument.

[28] The petitioner also claimed that his sixth and fourteenth amendment rights to confront the witnesses were violated when the trial court refused to allow his trial counsel to cross-examine the witnesses on charges pending against them to show bias, interest or motive. *United States ex rel. Annunziato* v. *Manson*, supra, 425 F. Supp. 1275. The District Court agreed; id., 1277; and the Second Circuit affirmed. *Annunziato* v. *Manson*, 566 F.2d 410, 414 (2d Cir. 1977).

[29] In this case, we also observe that the prosecutor must have thought it was important to deny that Ellis had been promised any consideration for his testimony because he stated in both his closing and rebuttal arguments that Ellis had everything to lose and nothing to gain in giving his statements to the police and that any expectations he might have were "in his mind . . . ."

[30] In reading *Giglio* and *Napue* against *Brady*, it becomes clearer how disclosure in *Brady* can mean disclosure to the defendant while disclosure in *Napue* and *Giglio* can mean disclosure to the jury. In *Brady* v. *Maryland*, supra, 373 U.S. 84, the suppressed evidence was a statement made to the police by a codefendant. Under the rules of evidence, such a statement would be admissible as evidence for substantive purposes. See also *State* v. *Whelan*, 200 Conn. 743, 753–54, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). When a witness gives false testimony, however, the prosecutor and the witness himself are the keepers of the truth. Without evidence of the falsity of the statement through admission by the witness, disclosure to the defendant or his counsel of any consideration the state offers to a cooperating witness is useless unless the jury gets to hear it.

[31] The ambiguity in what level of disclosure is required seems to have started with *State* v. *Paradise*, supra, 213 Conn. 388. Besides pointing out that *Giglio* is meant to ensure that the jury knows the facts, the court in *Paradise* also cited to a case from the United States Court of Appeals for the Third Circuit, which stated: "Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading." (Internal quotation marks omitted.) Id., 400, quoting *United States* v. *Harris*, 498 F.2d 1164, 1169 (3d Cir.1974), cert. denied sub nom. *Young* v. *United States*, 419 U.S. 1069, 95 S. Ct. 655, 42 L. Ed. 2d 665 (1974). This language from *Harris* that was cited in *Paradise* was later quoted in *State* v. *Ouellette*, supra, 295 Conn. 186, which was then cited in *Hines* without attribution to *Harris*. *Hines* v. *Commissioner of Correction*, supra, 164 Conn. App. 727–28. In *Ouellette*, however, the plea agreement with the cooperating witness was revealed to the defendant, judge *and the jury*. *State* v. *Ouellette*, supra, 187.

Additionally, *Harris* did not turn on what level of disclosure was required because "defense counsel waived their objections to the impropriety by consciously failing to take any steps to minimize the resulting prejudice." *United States* v. *Harris*, supra, 498 F.3d 1166. Indeed, in discussing the waiver issue, the court pointed out defense counsel's lack of effort to disclose the government's agreement with the cooperating witness *to the jury* or to proffer the prosecutor's stipulation regarding the same *to the jury*. Id., 1170.

Likewise, in *Paradise*, our Supreme Court found it unnecessary to determine if the defendant's claims regarding false testimony concerning an

agreement with the state were true because the cooperating witness stated in his testimony that he hoped to receive a lower sentence by testifying. *State* v. *Paradise*, supra, 213 Conn. 400–401. Because *the jury* actually learned of the witness' motivation for testifying, there was no *Giglio* violation. Id., 401. Thus, any citation to *Ouellette*, *Harris* or *Paradise* for the notion that *Giglio* is satisfied by disclosure to the court or defense without notifying the jury does not arise out of the facts of any of those cases.

Previously in this opinion, we also observed that *Brady*, *Napue* and *Giglio* often are conflated. See footnote 22 of this opinion; *United States* v. *Bagley*, supra, 473 U.S. 676. We have no doubt that this conflation plays a role in the confusion over what level of disclosure is required because disclosure to defense counsel is all that is required in a typical *Brady* case. See *State* v. *Dolphin*, 195 Conn. 444, 455–56, 488 A.2d 812 ("[e]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*"), cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985).

[32] Much like our Supreme Court said in *Ouellette* and elsewhere, we "are cognizant of the exhortation of the United States Supreme Court that 'it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' *Napue* v. *Illinois*, supra, 360 U.S. 269. Only through complete and candid disclosure of a witness' interest can *the jury* accurately gauge the credibility of the testimony proffered." (Emphasis added.) *State* v. *Ouellette*, supra, 295 Conn. 190.

[33] *Jenkins* was cited approvingly in *State* v. *Ouellette*, supra, 295 Conn. 186, for its discussion of the application of *Napue* and *Brady* to undisclosed plea agreements.

[34] The prosecutor even objected when defense counsel attempted to elicit the truth of any deal on cross-examination. *Jenkins* v. *Artuz*, supra, 294 F.3d 288.

[35] The only evidence placing the petitioner in *DuBose* at the crime scene other than the witness' testimony stemmed from "an incoherent and frenzied statement by [the petitioner] when he went to the police station looking for one of the investigating officers, and, while dashing his head on a railing, said something described by various witnesses as 'I killed him' or 'I kill 'im' or 'I'll kill him' and later, while rolling on the floor, accused the investigator of tricking him. The prosecution contended this was a confession." *DuBose* v. *Lefevre*, supra, 619 F.2d 974.

[36] *Wallach* also distinguishes between situations where the prosecutor knows or should have known of perjured testimony and those where he does not. In the case "[w]here the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Internal quotation marks omitted.) *United States* v. *Wallach*, supra, 935 F.2d 456. But, "[w]here the government was unaware of a witness' perjury . . . a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." (Internal quotation marks omitted.) Id. This is not a case where the prosecutor was unaware of what he promised to the witness, so we need only conclude that Ellis' false testimony could have affected the jury's judgment, which we do.

[37] Although, as noted, other federal Courts of Appeals have held that the prosecutor's knowing use of such false testimony in summation violates due process despite any disclosure to the defendant, we are particularly attuned to the Second Circuit opinions because, after the petitioner in this case exhausts his remedies in our state courts, it augurs how his case would turn out in federal court. That other circuits have ruled in the same manner only bolsters our conclusion.

[38] One federal Court of Appeals has gone so far as to hold that due process was violated where the prosecutor elicited false testimony from a government witness and argued during closing argument that the witness was credible, then conceded in rebuttal argument that the witness had lied, but argued that the lie was unimportant because the defense could no longer explain why the lie was important. *United States* v. *LaPage*, 231 F.3d 488, 492 (2000), amended, 271 F.3d 909 (9th Cir. 2001) (adding dissent). Another held that due process was violated despite the prosecutor disclosing some of the terms of the agreement to the jury in his opening statement because the whole agreement was not disclosed and "an opening statement is not evidence." *United States* v. *Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980).

[39] The respondent argues that the prosecutor's comment that Ellis had "nothing to gain" referred to his statements to police. At worst, the respon-

dent claims, the remarks were ambiguous. The respondent's argument ignores both the context of the statement and the bevy of other remarks the prosecutor made in summation that falsely implied that Ellis had been made *no promises* and that any expectations were in his mind.

[40] What occurred with Ellis' later pleas and sentence reductions is relevant in confirming that a promise, in fact, had been made, but only to prove that the petitioner's due process rights were violated at his criminal trial. Outside of this confirmation, neither our *Jordan* nor *Hines* analyses depends on what occurred after trial because the due process violation either occurred when the prosecutor failed to disclose to the jury his promise to Ellis (*Jordan*) or when the prosecutor relied on Ellis' false testimony in closing and rebuttal arguments (*Hines/Jenkins*).

[41] Although the petitioner used a double negative, it is clear from context that he did not want Douglas to testify about any involvement the petitioner may have had.

[42] The petitioner was sentenced to an effective sentence of sixty years of incarceration, which included a sixty year term for the murder charge, a twenty year term for the conspiracy to commit murder charge, which was ordered to run concurrent with the murder sentence, and a five year term for the tampering charge, which was ordered to run consecutive to the conspiracy sentence, but concurrent with the murder sentence. We note that the petitioner has been incarcerated since before his conviction on the charges and that he likely has served his sentence on the tampering conviction by this point in time.

———————————————————